UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
YARDLEY KESHINOVER,

                                Plaintiff,

    - against -

NEW YORK STATE OFFICE OF PARKS,
RECREATION AND HISTORIC
PRESERVATION,

                              Defendant.
--------------------------------------------------------------x

**OPINION & ORDER**

No. 17-CV-4349 (CS)

<u>Appearances</u>:

Michael G. O'Neill
New York, New York
*Counsel for Plaintiff*

Carly Weinreb
Assistant Attorney General
State of New York
New York, New York
*Counsel for Defendant*

<u>Seibel, J.</u>

       Before the Court is the motion for summary judgment of Defendant New York State

Office of Parks, Recreation and Historic Preservation ("State Parks" or "Defendant").  (Doc. 60.)

## I.    **BACKGROUND**

       The following facts are based on the parties' Local Civil Rule 56.1 Statements and

supporting materials and are undisputed except as noted.

A.      <u>Facts</u>

1.      **Parties**

Plaintiff Yardley Keshinover is a Hispanic male.  (*See* Doc. 70 ("P's 56.1 Resp.") ¶ 52.)[1]

Defendant is a New York state executive agency that employs approximately 240 park police

officers under its Division of Law Enforcement.  (*Id.* ¶¶ 1-2.)

2.      **Plaintiff's Job Application**

On November 17, 2012, Plaintiff took a civil service exam for the position of park police

officer and scored an eighty-five.  (*Id.* ¶ 3.)  Based on that score, Plaintiff was placed on an

"eligible list" as 1 of 4,368 individuals with a passing score.  (*See id.* ¶ 4.)  In 2014, Plaintiff was

one of approximately 1,200 individuals who scored eighty-five or higher on the exam "canvassed

for the position."  (*Id.* ¶ 5.)  Defendant sent Plaintiff an application packet that instructed him to

collect various documents and complete an Applicant Background Information Questionnaire,

(Doc. 66 ("Weinreb Decl.") Ex. 12 ("Background Questionnaire")), and an Applicant Integrity

Questionnaire, (*Id.* Ex. 11 ("Integrity Questionnaire")).  (P's 56.1 Resp. ¶ 7.)  Plaintiff was

required to provide his birth certificate, and the Background Questionnaire requested information

on his place of birth and home address, because U.S. Citizenship and New York residency are

prerequisites for the job.  (*See id.* ¶¶ 15-16.)  Plaintiff was further required to provide a copy of

his New York State Driver's License and driving abstract.  (*Id.* ¶¶ 17-18.)  Both the Background

and Integrity Questionnaires included questions on Plaintiff's education, finances and

---

[1] There is no entry explicitly stating Plaintiff's ethnicity in either Defendant's 56.1
Statement or Plaintiff's Response.  It appears, however, from both the Complaint, (Doc. 1 ¶ 5),
as well as other assertions in the 56.1 Statements referencing Plaintiff's ethnicity, (*see e.g.*, P's
56.1 Resp. ¶ 52 ("Captain Cappuccilli had never met Plaintiff and did not know that he was
Hispanic and/or Dominican."), and statements in the parties' briefs, (*see* Doc. 61 ("D's Mem.")
at 1 (asserting Plaintiff self-identified as Hispanic)), that there is no dispute that Plaintiff is
Hispanic.

creditworthiness, social security number, and criminal history.  (*Id.* ¶¶ 21, 23-24, 28.)  The

Integrity Questionnaire also included the following question, listed as question 4:

> Have you EVER been ARRESTED, issued an appearance ticket, questioned,
> detained or taken into custody by ANY police agency or security service?  This
> includes ANY juvenile offense(s) which may or may not have been sealed by a
> court, a prosecuting officer or a juvenile authority and ANY youthful offender
> determination(s).

(*Id.* ¶ 36 (quoting Integrity Questionnaire at 2).)  Plaintiff completed the questionnaires and sent

them in, along with Plaintiff's birth certificate, social security card, selective service registration,

and college transcript.  (*See id.* ¶¶ 10, 77-78.)

On May 17, 2014, Plaintiff met with a State Parks officer for a preliminary review of the

questionnaires.  (*Id.* ¶ 10.)  Plaintiff signed the two questionnaires under penalty of perjury in the

presence of the officer.  (*Id.* ¶11.)[2]  Plaintiff also initialed the paragraph on the first page of the

Integrity Questionnaire that read, in pertinent part:

> THE HONESTY AND INTEGRITY OF ALL APPLICANTS IS OF PRIMARY
> CONCERN DURING THE SELECTION PROCESS. . . .  THE ANSWERS THAT
> YOU GIVE TO THE FOLLOWING QUESTIONS SHOULD REFLECT YOUR
> COMMITMENT TO, AND UNDERSTANDING OF, THESE CRUCIAL
> VALUES.  FAILURE TO BE TRUTHFUL DURING THIS AND ALL OTHER
> PARTS OF THE SELECTION PROCESS WILL RESULT IN YOUR
> APPLICATION BEING REJECTED . . . .

(Integrity Questionnaire at 1; *see* P's 56.1 Resp. ¶ 12.)  That same day, Plaintiff passed an agility

test, a medical exam, a drug test, and a psychological evaluation.  (P's 56.1 Resp. ¶¶ 8-9.)

### 3.  Plaintiff's Initial Meeting with Officer Paul Cutler

Before being considered for hire as a State Parks officer, an applicant must submit to a

background check, and on June 19, 2014, Plaintiff met with Officer Cutler for an "initial

---

[2] Only the Background Questionnaire states that it was signed under penalty of perjury,
(Background Questionnaire at 22), but Plaintiff concedes that the Integrity Questionnaire was as
well, (P's 56.1 Resp. ¶ 11).

background investigation interview." (*Id.* ¶¶ 13-14.)  As part of the background check, Officer Cutler was required to verify the information that Plaintiff provided in both questionnaires.  (*See id.* ¶¶ 16-18, 21, 23, 35.)  During the meeting, Officer Cutler gave Plaintiff the opportunity to ask questions or change his questionnaire answers.  (*Id.* ¶ 37.)  Plaintiff had answered "NO" to question 4 of the Integrity Questionnaire reproduced above, and Plaintiff did not change his answer when provided an opportunity to do so during his initial meeting with Officer Cutler. (*See id.* ¶ 37; Integrity Questionnaire at 2.)  Plaintiff did, however, change his answer to question 11 on the Integrity Questionnaire, which asked whether Plaintiff had ever been a party to a civil lawsuit.  (P's 56.1 Resp. ¶ 37; *see* Integrity Questionnaire at 3.)

Plaintiff alleges that during the meeting, Officer Cutler refused to shake Plaintiff's hand and spoke in a hostile tone.  (P's 56.1 Resp. ¶¶ 80-81.)  Defendant disputes these assertions, (Doc. 73 ("D's 56.1 Counter Resp.") ¶¶ 80-81), and point to Plaintiff's deposition in which he stated that Officer Cutler spoke with "[n]o tone," (Weinreb Decl. Ex. 8 ("Keshinover Dep.") at 82:21.)  Plaintiff, however, also testified at his deposition that Officer Cutler's demeanor was "[d]ismissive" and "insulting" and that Officer Cutler asked "insulting questions." (*Id.* at 81:8-11, 85:8-9.)  During the interview, Officer Cutler asked Plaintiff if English was his first language, if he was born in the United States (despite Plaintiff having submitted his U.S. birth certificate), if he finished his G.E.D. (despite Plaintiff having submitted his college transcript), and if he had a "real" social security number.  (*Id.* ¶¶ 82-85.)  Plaintiff had filled out his social security number on the two questionnaires, but the number was scribbled out and rewritten on the Integrity Questionnaire, (Integrity Questionnaire at 1), and was slightly written over and corrected in the Background Questionnaire, (Background Questionnaire at 2).

###### 4.     Plaintiff's Juvenile History

Officer Cutler was also required to do a criminal background check on Plaintiff, and Plaintiff signed a "Release Records form," which granted Officer Cutler access to records related to Plaintiff's criminal history.  (P's 56.1 Resp. ¶¶ 29-30.)  As part of the criminal background check, Officer Cutler contacted Troop K of the New York State Police ("Troop K") and inquired whether it had any prior contact with Plaintiff.  (*Id.* ¶ 39.)  Troop K's response stated that it had contact with Plaintiff regarding a "juvenile matter."  (*Id.*; Weinreb Decl. Ex. 18 at 2.)  Troop K had generated an arrest report for Plaintiff stemming from a 2005 incident when Plaintiff was a juvenile and had issued Plaintiff an appearance ticket for reckless endangerment in the second degree.  (Weinreb Decl. Ex. 23 at PARKS65; Doc. 69 ("O'Neill Decl.") Ex. C.)[3]  The ticket instructed Plaintiff to appear at "the probation service of Dutchess County," (O'Neill Decl. Ex. C), and Plaintiff did so appear with his parents and was interviewed by a social worker, (D's 56.1 Counter Resp. ¶ 95).

The appearance ticket was issued in August 2005, when Plaintiff was fourteen years old, after he had what he described as a "snake berry battle" with friends, meaning he and his friends threw berries at one another.  (*Id.* ¶ 87.)  After he had left his friends and gone home, two officers arrived at his house, stated that an alleged victim had been hit in the eye by one of the berries, and asked Plaintiff questions.  (*See id.* ¶¶ 88, 91, 93.)  Plaintiff testified in his deposition that he was free to leave, (*id.* ¶¶ 91-92), but he also claimed that the officers approached his home with their guns drawn, and at least one pointed a gun at him, (Keshinover Dep. at 181:9-16; *see* Weinreb Decl. Ex. 38 at 43:10-16, 47:7-8 (Larry Keshinover, Plaintiff's father, testifying

---

[3] Officer Cutler did not receive a copy of the arrest report until approximately mid-August 2014.  (*See* Doc. 63 ¶ 74.)

to the same); *id.* Ex. 26 at 2 (same)).  Plaintiff was not aware that the officers later filed an

"arrest report" or charged him with reckless endangerment.  (P's 56.1 Resp. ¶ 93.)  Plaintiff

states that he never received the appearance ticket because his father took it out of the mailbox

and never told Plaintiff about it or showed it to him.  (*Id.* ¶ 94.)  Plaintiff states that no family

court proceeding was ever filed against him, and because his parents brought him to see a social

worker, Plaintiff was not aware that he was the subject of juvenile proceedings.  (*Id.* ¶¶ 101,

103.)  Plaintiff states that the social worker told him he would never have to discuss the incident

in the future.  (*Id.* ¶ 104.)

### 5.    Officer Cutler's Follow-Up Communications with Plaintiff and His Father

On July 16, 2014, Officer Cutler emailed Plaintiff and asked whether Plaintiff had "ever

been in family court as a juvenile."  (Weinreb Decl. Ex. 22.)  Plaintiff responded, "I have never

appeared in front of any family court justice."  (*Id.*)  Officer Cutler then sent Plaintiff another

email asking:

> Have you ever had any contact with any police or peace officer either as a juvenile
> or adult for any reason?[]  This would include any contact even as a respondent for
> any matter in family court, etc.  This also would include any type of tickets that
> may have been issued to you or your parents on your behalf even if later dismissed
> or case sealed.

(*Id.* Ex. 24.)  Plaintiff responded via email, "I welcome the opportunity to have a meeting with

you whenever possible to answer any questions you may have."  (*Id.*)  Officer Cutler and

Plaintiff scheduled a meeting for July 23, 2014.  (P's 56.1 Resp. ¶ 44.)

Before the meeting, Larry Keshinover emailed Officer Cutler, stating:

> My son advised me that you needed further information on an alleged incident that
> happened when my son was 13. . . .  Be advised my son never appeared before any
> family    court    judge,    never    fingerprinted,    no    photos    period.
>
> . . . .  Approx. 10 or 11 years ago, Two State Troopers . . . pounded on my door in
> the summer at approx. 730 pm.  Screaming to speak to Yardley.  I called Yardley

to come to the door, the male trooper[] pointed a gun at my son's face, then told me
I would be arrested too for questioning him.  However, I asked the troopers why
are you here?  They said my son hit a woman in the eye with a cherry.

(Weinreb Decl. Ex. 26.)  On July 20, 2014, Larry Keshinover wrote another email to Officer

Cutler, this time stating:  "[E]very person deserves a second chance . . . . [W]hy hate on my son

by using the word 'problem', when he was told by the courts that everything would be expunged,

and no criminal anything."  (*Id.* Ex. 27.)

On July 20, 2014, Officer Cutler forwarded Plaintiff's father's emails to Captain Michael

Cappuccilli, Officer Cutler's supervisor.  (P's 56.1 Resp. ¶ 49.)  Officer Cutler and Captain

Cappuccilli met to discuss the emails, and Officer Cutler explained that Plaintiff's disclosures in

his Integrity Questionnaire were inconsistent with what Officer Cutler had learned from Troop K

and Larry Keshinover, and accordingly Officer Cutler believed that Plaintiff had not been

truthful in his answer to question 4 on the Integrity Questionnaire.  (*Id.* ¶¶ 48-49.)[4]  Officer

Cutler and Captain Cappuccilli did not discuss Plaintiff's ethnicity during the meeting.  (*Id.*

¶ 52.)  Captain Cappuccilli told Officer Cutler to offer Plaintiff the opportunity to sign a

_____

[4] A properly asserted fact is not considered disputed if a party states it does not have
knowledge sufficient to respond to the opposing party's asserted statement of material fact.  *See*
Local Civil R. 56.1(c) (each paragraph in a Rule 56.1 Statement "will be deemed to be
admitted . . . unless specifically controverted"); *Walker v. City of N.Y.*, 63 F. Supp. 3d 301,
305 n.4 (E.D.N.Y. 2014) (collecting cases), *aff'd* 621 F. App'x 74 (2d Cir. 2015) (summary
order).  Accordingly, Plaintiff's assertion that he has no independent basis to determine what
Officer Cutler told Captain Cappuccilli in their meeting does not create a fact dispute, and
Defendant's assertions regarding Officer Cutler and Captain Cappuccilli's discussion are deemed
admitted for the purpose of this summary judgment motion.  For the same reason, the other
statements for which Plaintiff responds that he lacks sufficient knowledge to admit or deny are
deemed admitted for the purposes of this motion.  Plaintiff had the opportunity to take discovery,
and if after that opportunity he is not in a position to dispute an assertion of fact, it is properly
regarded as undisputed.  The Court is aware, however, that on a motion for summary judgment,
the Court must "disregard all evidence favorable to the moving party that the jury is not required
to believe."  *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 151 (2000).

declination statement withdrawing his application from consideration.  (Doc. 64 ("Cappuccilli Aff.") ¶ 22.)[5]

### 6.      The July 23 Meeting

On July 23, 2014, Officer Cutler and Plaintiff met at the Taconic Park Police Station. (P's 56.1 Resp. ¶ 55.)  Unbeknownst to Officer Cutler, Plaintiff recorded their conversation.  (*Id.* ¶ 56; *see* Weinreb Decl. Ex. 29 ("July 23 Tr.") (transcript of the recorded conversation).)  Officer Cutler asked Plaintiff if he had ever been questioned as a juvenile, to which Plaintiff said yes. (July 23 Tr. at 4:2-4.)  Officer Cutler asked Plaintiff if he was issued an appearance ticket, and Plaintiff said he was not.  (*Id.* at 4:18-20.)  Plaintiff asked if he could "explain the whole thing," but Officer Cutler responded, "Just answer my questions."  (*Id.* at 4:22-24.)  After further questioning, Plaintiff continued to deny that he was issued an appearance ticket but stated that following the snake berry incident, he had met with a social worker, who he conceded was a "juvenile authority."  (*See id.* at 5:6-19.)  Plaintiff stated that the reason he did not disclose his police contact or meeting with the social worker was because the social worker had told him that he "would never have to disclose [the incident] under any, any condition, whether employment or not."  (*Id.* at 6:14-20.)  Officer Cutler responded, "[T]his is a police [job], this isn't a job at McDonalds."  (*Id.* at 7:4-5.)  Officer Cutler went on to explain that "the issue" was that Plaintiff

---

[5] Plaintiff disputes this fact, stating that "Cutler testified in his deposition that Cappuccilli expressed the thought that it might be in [P]laintiff's best interest to decline, but did not actually instruct Cutler to obtain a declination."  (Ps' 56.1 Resp. ¶ 51.)  But Defendant does not assert that Captain Cappuccilli instructed Officer Cutler to obtain Plaintiff's declination.  Rather, Defendant asserts that Captain Cappuccilli instructed Officer Cutler to give Plaintiff the opportunity to sign a declination, which is consistent with Captain Cappuccilli's affidavit, (Cappuccilli Aff. ¶ 23 ("I did not order Officer Cutler to obtain Plaintiff's declination.  I instructed Officer Cutler to offer Plaintiff the option to decline."), and is consistent with Officer Cutler's deposition testimony that he was never instructed to "go and get a declination," but was told that it may be in Plaintiff's "best interest to decline," (Weinreb Decl. Ex. 3 at 38:14-39:2). Accordingly, this fact is undisputed.

"tried to hide" his juvenile record, and had Plaintiff revealed this information "up front . . . we wouldn't even be having this conversation.  I'd be continuing your background [investigation], I don't see where there would be any real[] problem with that."  (*Id.* at 7:25-8:5.)

> Plaintiff again tried to explain his side of the story, but Officer Cutler stated,
>
> [Y]ou can tell me what you'd like to tell me, but . . . I've already spoken to a supervisor . . . [a]nd before you say any more, he's offered me, he's offering to you, you can sign a declination statement . . . .  [A]s far as I'm concerned, if you sign this declination . . . [the discrepancy between the Integrity Questionnaire and background check is] not even going in my report, okay. . . .
>
> So, if you'd like to sign an applicant declination, you can do so.  My investigation stops and none of this juvenile stuff goes in here.  And that way you would have an opportunity for another law enforcement job somewhere else.

(*Id.* at 8:19-9:10, 10:7-12.)

> Officer Cutler suggested that Plaintiff's chances of being accepted for the position were lower than those of applicants without discrepancies in their applications, stating:
>
> [R]emember I told you how competitive this job is?  It's extremely competitive.  So let's say we have, we have you.  And we have another person, okay.  They don't have any discrepancies.  Then it comes to you, well you have a discrepancy.  Who do you they're going to prefer to hire?  A person with no discrepancies.

(*Id.* at 13:18-24.)  Officer Cutler further explained that if Plaintiff did not sign the declination, the discrepancy would be noted in Plaintiff's file, which would then have to be reported to other law enforcement:

> If another police agency looks at your packet and it's not perfect, and they'll say why didn't you get hired, they're going to come to our agency, okay.  They're going to say why didn't you hire him, and the agency will say we didn't hire him because A, B, C or D, and they'll say, okay, thank you, okay.  What I'm saying is a declination statement is my investigation stops here and now. . . .  So nothing is going to go with my report at this point . . . .

(*Id.* at 22:12-22.)  Numerous times during the conversation Officer Cutler told Plaintiff that he did not have to sign the declination, but if he chose not to, the investigation would continue.  (*Id.* at 17:5-9 ("If you don't wish to sign the declination, I'll finish my report.  Okay.  But I have to

put in there, during my investigation, this is what I found out, how you answered to that question."); *id.* at 17:18-19 ("[R]ead it thoroughly, really considering signing it, fine, if you're not, you're not."); *id.* at 18:11-13 ("If you don't wish to sign this fine, I'll finish, I'll finish your background investigation, okay.").  Additionally, when Plaintiff specifically asked if he would not get the job if he declined to sign the declination, or if there was a "strong likelihood" he would not get the job, Officer Cutler stated, "I didn't say that."  (*Id.* at 19:2-9.)  Office Cutler later reiterated, "[T]hat's once again, not what I said, sign the declination. . . .  That's entirely up to you."  (*Id.* at 22:5-8.)  Plaintiff stated that he understood and confirmed, "I'm not saying you told me to sign anything."  (*Id.* at 22:10-11.)

During the conversation, Officer Cutler explained that he does not get to decide who is hired, but rather, Officer Cutler makes a recommendation as to who should be hired, and an applicant without discrepancies would "have a much better chance" of getting the job than someone like Plaintiff who had a discrepancy.  (*Id.* at 19:11-25.)  Indeed, neither Officer Cutler nor Captain Cappuccilli had the authority to make State Parks hiring decisions.  (*See* P's 56.1 Resp. ¶ 53.)  Their roles were limited to recommending or not recommending applicants.  (*Id.*)  The hiring decisions are made by the Chief of the Park Police.  (*Id.* ¶ 54.)

Toward the end of the conversation, Officer Cutler said that he wanted to speak with Captain Cappuccilli to have the investigation "turned over to somebody else" because Officer Cutler believed that Plaintiff perceived that Officer Cutler was "being unfair," but Plaintiff responded that Officer Cutler did not need to turn the case over to another officer and added "I completely respect everything you've done so far."  (July 23 Tr. at 21:12-22:1.)  Plaintiff asked for some time to make his decision regarding the declination, and Officer Cutler said it was fine if Plaintiff got back to him later that night.  (*See id.* at 18:1-4.)  Plaintiff states that he was cut off

nineteen times during the conversation and that Officer Cutler never allowed Plaintiff to explain the snake berry incident.  (P's 56.1 Resp. ¶¶ 114-116.)

Plaintiff left the police station and, after conferring with his father, returned and signed the declination.  (*Id.* ¶ 71.)  Officer Cutler, however, gave Plaintiff the wrong form to sign, so later that same day, Officer Cutler went to Plaintiff's home where Plaintiff signed the correct declination.  (*Id.* ¶ 72.)  The signed form stated, "I declare that this Statement of Declination is true and is made of my own free will, without fear or threat of physical harm and without coercion.  I further declare that I was not told or prompted what to say in this statement." (Weinreb Decl. Ex. 30.)

### 7.    Application Process

Plaintiff states that, under the civil service law, State Parks is limited in its ability to reject candidates that meet the prerequisites for the position.  (P's 56.1 Resp. ¶ 118.) Specifically, Plaintiff alleges that State Parks can reject only three qualified candidates and then must offer jobs to candidates in order of their test scores.  (*Id.*)  Only if there are more candidates with the same score than there are available positions may State Parks select which candidates to hire, and even then, the non-selected candidates are not rejected but are instead returned to the list of employees eligible for hire.  (*Id.* ¶ 119.)  Defendant argues that there typically are dozens of candidates with the same score among whom it can choose.  (D's 56.1 Counter Resp. ¶ 118.) Plaintiff met the statutory requirements for the position, and even assuming he lied on his Integrity Questionnaire, he states that would not disqualify him.  (P's 56.1 Resp. ¶¶ 121-122.)

### 8.    Other Applicants

Attached to its motion papers, Defendant provided a list of the application outcomes of: (1) "members from the 2014 Cohort who executed declinations after passing the agility, medical, and psychological testing;" (2) "members from the 2014 Cohort who passed the agility, medical, and

psychological testing but were not hired;" (3) "members from the 2014 Cohort who were offered a spot in the Academy;" and (4) "members interviewed by Officer Cutler from January 1, 2012 to the present." (Weinreb Decl. Ex. 2 at 9, 15-19.)[6]  The Applicant List, excluding Plaintiff, included eighty-seven applicants in all, and there were noted discrepancies for twenty-five of those eighty-seven. (Applicant List.)  Nineteen of those twenty-five were listed as "White" and "Non-Hispanic." (*Id.*)

Plaintiff alleges that one of those nineteen, identified as candidate 2719, was a White applicant whom Officer Cutler investigated and recommended for hire despite having more egregious discrepancies than Plaintiff. (*See* P's 56.1 Resp. ¶¶ 126-136.)  Like Plaintiff, candidate 2719 answered "NO" to question 4 on the Integrity Questionnaire, (*id.* ¶ 127), but candidate 2719 had been arrested on multiple occasions for moving violations and littering, (*id.* ¶ 128).  Defendants say in their 56.1 Counter Response that it was one arrest. (D's 56.1 Counter Resp. ¶ 128).  When Officer Cutler discovered this discrepancy, he permitted candidate 2719 to change his answer to question 4 to "YES." (P's 56.1 Resp. ¶ 130.)  Candidate 2719 was hired. (*Id.* ¶ 131; Applicant List at 18.)

### B.   Procedural History

On June 9, 2017, Plaintiff filed his Complaint, (Doc. 1), and Defendant answered on October 13, 2017, (Doc. 8).  On March 4, 2019, the parties submitted their briefing on the instant

---

[6] The pages of Exhibit 2 are not consecutively paginated, so for ease of reference, the Exhibit is cited herein to the page numbers generated by the Electronic Case Filing System. Pages 15 through 19 of that Exhibit will be cited herein as the "Applicant List."

motion, including Defendant's memorandum of law in support, (D's Mem.), Plaintiff's

opposition, (Doc. 71 ("P's Opp.")), and Defendant's reply, (Doc. 67 ("D's Reply")).

## II.    LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  "[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that

a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome of the suit

under the governing law . . . .  Factual disputes that are irrelevant or unnecessary will not be

counted."  *Id.*  On a motion for summary judgment, "[t]he evidence of the non-movant is to be

believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255.

The movant bears the initial burden of demonstrating "the absence of a genuine issue of

material fact," and, if satisfied, the burden then shifts to the non-movant to "present evidence

sufficient to satisfy every element of the claim."  *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d

Cir. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  "The mere existence of a

scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be

evidence on which the jury could reasonably find for the [non-movant]."  *Anderson*, 477 U.S. at

252.  Moreover, the non-movant "must do more than simply show that there is some

metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

475 U.S. 574, 586 (1986), and he "may not rely on conclusory allegations or unsubstantiated

speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (internal

quotation marks omitted).

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1).  Where an affidavit is used to support or oppose the motion, it "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated."  *Id.* 56(c)(4); *see Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008).  In the event that "a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it."  Fed. R. Civ. P. 56(e).

## III.   DISCUSSION

Claims of discrimination under Title VII are analyzed using the familiar burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Walsh v. N.Y.C. Hous. Auth.*, 828 F.3d 70, 74-75 (2d Cir. 2016).  First, a plaintiff must demonstrate "(1) she was within the protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination."  *Naumovski v. Norris*, 934 F.3d 200, 214 n. 39 (2d Cir. 2019) (internal quotation marks omitted); *see Coger v. Conn. Dep't of Pub. Safety*, 143 F. App'x 372, 374 (2d Cir. 2005) (summary order) (plaintiff must establish a *prima facie* case that "(1) he is a member of a protected class; (2) he was qualified for the position for which he

14

applied; (3) he was denied the job; and (4) the denial occurred under circumstances giving rise to an inference of discrimination on a basis forbidden by Title VII.").

Once a *prima facie* case is established, a "rebuttable presumption of discrimination arises" and the burden of production shifts to the defendant "to articulate a legitimate, nondiscriminatory reason" for the adverse employment action. *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 134 (2d Cir. 2000). Once the defendant proffers a legitimate, non-discriminatory reason, the presumption drops away, and the plaintiff must prove that the reason offered by the defendant was not its true reason but rather a pretext for unlawful discrimination. *See Reeves*, 530 U.S. at 143; *Roge v. NYP Holdings, Inc*., 257 F.3d 164, 168 (2d Cir. 2001), *as amended* (June 6, 2001); *Slattery v. Swiss Reinsurance Am. Corp*., 248 F.3d 87, 91 (2d Cir. 2001). The plaintiff must produce "sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment action." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000) (alterations and internal quotation marks omitted). The ultimate burden of persuasion remains with the plaintiff to show that the defendant intentionally discriminated. *Reeves*, 530 U.S. at 143.

Defendant argues that Plaintiff has failed to establish a *prima facie* case. (D's Mem. at 11-23.) Plaintiff argues that "modern summary judgment practice largely bypasses the *prima facie* stage and focuses on the last stage of the *McDonnell Douglas* test." (P's Opp. at 3-4.) Accordingly, Plaintiff contends, the Court need not determine whether Plaintiff has established a

*prima facie* case of discrimination and can skip right to the third step of the *McDonnell Douglas* test.  (*Id.* at 4-5.)

"The burden of establishing a *prima facie* case is not onerous, and has been frequently described as minimal."  *Walsh*, 828 F.3d at 75 (internal quotation marks omitted).  And there are circumstances in which a court will presume a plaintiff has established a *prima facie* case and proceed directly to the third step of *McDonnell Douglas*.  *See id.* at 75-76 ("In part because [plaintiff's] burden at the *prima facie* stage is minimal, and because [plaintiff] does not argue that [defendant] failed to proffer a legitimate, nondiscriminatory explanation for its adverse employment action . . . [w]e thus proceed directly to the third step of the *McDonnell Douglas* analysis . . . ."); *Terpstra v. Shoprite Supermarket, Inc.*, No. 17-CV-6840, 2019 WL 3338267, at *5 (S.D.N.Y. July 25, 2019) (collecting cases), *appeal docketed*, 19-2570 (2d Cir. Aug. 16, 2019).  *But see Meyer v. N.Y. State Office of Mental Health*, 679 F. App'x 89, 90 (2d Cir.) (summary order) (affirming summary judgment dismissing plaintiff's claim for failure to establish a *prima facie* case), *cert. denied*, 138 S. Ct. 143 (2017).  But in the cases on which Plaintiff relies, as well as others in which the Court has presumed a *prima facie* case, there was no dispute as to whether the plaintiff established an adverse employment action.  *See U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 713 (1983) (failure-to-promote claim where non-black applicant was promoted over black plaintiff); *Walsh*, 828 F.3d at 75 ("uncontested" that plaintiff suffered adverse employment action); *Bennett v. Health Mgmt. Sys., Inc.*, 936 N.Y.S.2d 112, 114 (App. Div. 2011) (undisputed plaintiff was terminated).

Here, in contrast, Defendant argues that Plaintiff never suffered an adverse employment action, and Plaintiff failed to identify an analogous case in which a court presumed a *prima facie* case in those circumstances.  *See During v. City Univ. of N.Y.*, No. 01-CV-9584, 2005 WL

2276875, at *10 (S.D.N.Y. Sept. 19, 2005) ("Without an adverse employment action, this incident cannot give rise to a *prima facie* case.").  Further, because the third step of the *McDonnell Douglas* test turns on whether the "*adverse employment decision* was motivated by discrimination," *Dotson v. City of Syracuse*, 763 F. App'x 39, 41 (2d Cir. 2019) (summary order) (emphasis added) (internal quotation marks omitted), the Court must first address the threshold question of whether Plaintiff suffered an adverse employment action.

Defendant argues that Plaintiff did not suffer an adverse employment action because Plaintiff voluntarily withdrew his application before Defendant decided whether he would be hired.  (D's Mem. at 12-15.)  Plaintiff responds that "when an employer makes clear that an application would be futile, the failure to pursue the application does not bar a claim for discrimination."  (P's Opp. at 5.)

Where "the adverse action upon which [plaintiff] seeks to rely is h[is] own decision to withdraw, not anything that the Defendants said or did," that plaintiff has failed to meet his *prima facie* burden.  *Geagan v. City Univ. of N.Y.*, No. 09-CV-3271, 2011 WL 3370395, at *12 (S.D.N.Y. July 14, 2011).  "Even if Defendants discouraged Plaintiff from applying for [a] position[], or encouraged Plaintiff to withdraw his sole application, such discouragement would not give rise to a claim for failure to promote."  *Johnston v. Carnegie Corp. of N.Y.*, No. 10-CV-1681, 2011 WL 1085033, at *11 (S.D.N.Y. Feb. 24, 2011), *report and recommendation adopted*, 2011 WL 1118662 (S.D.N.Y. Mar. 23, 2011); *see Grimes-Jenkins v. Consol. Edison Co. of N.Y., Inc.*, No. 16-CV-4897, 2017 WL 2258374, at *7 (S.D.N.Y. May 22, 2017) (dismissing failure-to-promote claim where plaintiff "allege[d] that she was discouraged from applying while less qualified men were encouraged to apply" and collecting cases), *report and recommendation adopted*, 2017 WL 2709747 (S.D.N.Y. June 22, 2017); *see also Barcher v. N.Y. Univ. Sch. of*

*Law*, 172 F.3d 37 (Table), No. 98-7305, 1999 WL 39009, at \*1 (2d Cir. Jan. 27, 1999) (summary order) (no adverse employment action where plaintiff withdrew application before learning employer would reject it).[7]  "However, where a plaintiff can prove that completing an application process would have been futile based on an employer's discriminatory practices, a potential job applicant need not prove that he or she formally applied and was rejected."  *Pelaez v. Life Alert, Inc.*, No. 09-CV-1668, 2011 WL 1321999, at \*4 (E.D.N.Y. Mar. 30, 2011); *see Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 365-66 (1977) ("When a person's desire for a job is not translated into a formal application solely because of his unwillingness to engage in a futile gesture he is as much a victim of discrimination as is he who goes through the motions of submitting an application."); *Malarkey v. Texaco, Inc.*, 983 F.2d 1204, 1213 (2d Cir. 1993) ("[T]he rule is that a plaintiff's failure to apply for a position is not a bar to relief when an employer's discriminatory practices deter application or make application a futile endeavor.").

Plaintiff argues that because Officer Cutler stated "that plaintiff had no chance of being employed by the Park Police . . . plaintiff's withdrawal of his application is no impediment to his claim."  (P's Opp. at 6.)  To support his argument, Plaintiff points to Officer Cutler's statement:

> [R]emember I told you how competitive this job is?  It's extremely competitive.
> So let's say we have, we have you.  And we have another person, okay.  They don't
> have any discrepancies.  Then it comes to you, well you have a discrepancy.  Who
> do you think they're going to prefer to hire?  A person with no discrepancies.

---

[7] "The case law does not distinguish between the legal standards for a failure to hire claim and a failure to promote claim."  *O'Leary v. NY State Unified Court Sys.*, No. 05-CV-6722, 2007 WL 2244483, at \*5 n.14 (S.D.N.Y. Aug. 6, 2007).  The logic of the failure-to-promote case applies equally to failure to hire in any event.  *See Collette v. St. Luke's Roosevelt Hosp.*, No. 99-CV-4864, 2002 WL 31159103, at \*9 (S.D.N.Y. Sept. 26, 2002) (applying to failure-to-hire context the holding in *Brown v. Coach Stores, Inc.*, 163 F.3d 706, 711-12 (2d Cir. 1998), that *prima facie* case for failure to promote fails where plaintiff did not apply for the position).

(*Id.* (quoting July 23 Tr. 13:18-24).)  I find inaccurate Plaintiff's characterization of Officer

Cutler's statement as meaning that Plaintiff had "no chance" of being hired.  In fact, when

Plaintiff asked if he would not get the job if he chose not to sign the declination, or if there was a

"strong likelihood" he would not get the job, Officer Cutler stated, "I didn't say that."  (July 23

Tr. at 19:2-9.)  Rather, Officer Cutler explained that a candidate without discrepancies would be

more desirable for the job than a candidate with discrepancies.  And statements advising an

applicant of the chances that he will get the position "so that []he could make an informed

decision to apply or not to apply" are "in no way egregious" and not actionable.  *Fiorillo v.*

*United Techs. Corp.*, No. 13-CV-1287, 2016 WL 1118789, at *22 (D. Conn. Mar. 21, 2016)

(pointing out responsibilities of position does not support claim that defendant "talked [plaintiff]

out of applying").

　　　　Further, Plaintiff's argument that his application was futile is belied by his own evidence.

He states that he would have been hired, or at least not been rejected, had he not withdrawn his

application.  (*See* P's 56.1 Resp. ¶¶ 118-122; P's Opp. at 7.)  Plaintiff cannot argue that he would

have been hired but for his withdrawal, yet also argue that he withdrew because he was certain

he would not be hired.  *Cf. Jackson-Bey v. Hanslmaier*, 115 F.3d 1091, 1096-98 (2d Cir. 1997)

(no claim of futility where Plaintiff could have received accommodation he sought had he tried).

Even if Plaintiff thought the application was futile at the time of the withdrawal and only later

learned that it would not have been, he is still required to make at least some "showing that [he]

would in fact have been discriminated against had he applied for the position or benefit in

question," *Pelaez*, 2011 WL 1321999, at *6, which Plaintiff has failed to do because he has

presented evidence of the opposite:  that he would have been hired or at least not rejected had he

not withdrawn.  He thus cannot establish, as required, that "he would have been discriminatorily

rejected had he actually applied." *Id.* (internal quotation marks and emphasis omitted).  Indeed, he has not shown that he would necessarily have been rejected at all, and had he been rejected for the reasons cited by Officer Cutler – that a candidate without a discrepancy was a more attractive hire than someone with one – that would not have been a rejection on the basis of ethnicity.

Plaintiff also argues that Defendant's "discriminatory practice" deterred Plaintiff from applying for the position, and therefore Plaintiff's "failure to apply is not fatal" to his claim.  (P's Opp. at 5.)  Plaintiff points to the following statement by Officer Cutler to support his argument:

> If another police agency looks at your packet and it's not perfect, and they'll say why didn't you get hired, they're going to come to our agency, okay.  They're going to say why didn't you hire him, and the agency will say we didn't hire him because A, B, C or D, and they'll say, okay, thank you, okay.

(*Id.* (quoting July 23 Tr. at 22:12-18).)  Plaintiff does not spell out what "discriminatory practice" this statement reflects, but it appears that his argument is that there is something wrong with State Parks's policy of noting discrepancies between questionnaire responses and the results of background checks, which could prevent applicants from getting jobs at other law enforcement agencies if those agencies inquire as to why State Parks did not hire the applicants. (*See id.* at 6.)  This argument is untenable.  Plaintiff has failed to provide any evidence that this practice is applied discriminatorily to Hispanics or otherwise establish a link between the practice and Officer Cutler's allegedly discriminatory conduct.  To the contrary, Officer Cutler's statement that he would be required to note the discrepancy in Plaintiff's file was not applied only to Hispanic or non-white applicants, and there is no other evidence upon which I can infer that the policy was discriminatory.  Further still, Officer Cutler noted discrepancies for two Hispanic applicants – Candidates 02365 and 03271 – both of whom Officer Cutler recommended for hire, (Applicant List at 15, 19), suggesting that this practice was not a discriminatory one.

While "the rule is that a plaintiff's failure to apply for a position is not a bar to relief when an employer's discriminatory practices deter application or make application a futile endeavor," *Malarkey*, 983 F.2d at 1213, such deterrence must be grounded in *discriminatory practices*, *see id.*; *Vargas v. Chubb Grp. of Ins. Cos.*, No. 99-CV-4916, 2002 WL 31175233, at *4 n.10 (S.D.N.Y. Sept. 30, 2002) (Plaintiff able to maintain claim despite not applying because she "was discouraged from applying *for discriminatory reasons*").  Plaintiff has failed to establish any discrimination on the part of Officer Cutler in enforcing his policy of reporting the discrepancy in Plaintiff's application packet, and thus even if Officer Cutler's statements did deter Plaintiff from applying, it does not provide Plaintiff with a basis to allege an adverse employment action after voluntarily withdrawing his application.

It is hard to see how Plaintiff can complain that he was offered the opportunity to withdraw his application, rather than generate a discrepancy report that might impair his chances at employment by another agency.  While it may well be that the discrepancy in Plaintiff's case was not serious enough to preclude his employment, his responses to Cutler's emails were oddly worded and arguably evasive, (*see* Weinreb Decl. Exs. 22, 24), and his father confirmed that Plaintiff had in fact been questioned or detained by the police, (*id.* Exs. 26-27), yet had not disclosed these facts despite the Integrity Questionnaire plainly seeking this information, even on sealed matters.  In these circumstances, Officer Cutler was offering well-founded advice that it might be better for Plaintiff in the long run if the discrepancy were not documented.  *Cf. In re Application of Hampshire Recreation, LLC v. Village of Mamaroneck*, No. 14-CV-7228, 2016 WL 1181727, at *14 (S.D.N.Y. Mar. 25, 2016) (village board members' statements that land use application likely to be rejected was well-founded advice insufficient to show application would be futile), *aff'd sub nom. Hampshire Recreation, LLC v. The Village of Mamaroneck*, 664 F.

App'x 98 (2d Cir. 2016) (summary order).  A reasonable jury could not find that Officer Cutler offering the opportunity to withdraw, or even encouraging the same, was an act of discrimination that would permit a finding of an adverse employment action despite Plaintiff's withdrawal.[8]

Based on the foregoing, Plaintiff has not established that he suffered an adverse employment action, and he therefore cannot establish his *prima facie* case of discrimination. Accordingly, Defendant is entitled to summary judgment.[9]

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, Defendant's motion for summary judgment is GRANTED. The Clerk of Court is respectfully directed to terminate the pending motion, (Doc. 60), enter judgment for Defendant, and close the case.

**SO ORDERED.**

Dated: October 15, 2019
       White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.

---

[8] Nor is there any indication that Captain Cappuccilli knew of Plaintiff's ethnicity, so his instructions to Officer Cutler to offer Plaintiff the opportunity to decline cannot be considered discriminatory.

[9] Because the Court finds that Plaintiff has failed to establish that he suffered an adverse employment action, and therefore failed to establish a *prima facie* case of discrimination, I need not address Defendant's other arguments regarding Plaintiff's *prima facie* case.  Further, because Plaintiff has failed to establish a *prima facie* case, I need not address the second or third steps of the *McDonnell Douglas* test.